UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| LINDA LEE LEININGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   4:12CV623 JCH |
| | ) | (TIA) |
| CAROLYN W. COLVIN,[1] | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves Applications for Disability Insurance Benefits under Title II of the

Social Security Act and for Supplemental Security Income under Title XVI of the Act.  Claimant

has filed a Brief in Support of her Complaint, and the Commissioner has filed a Brief in Support

of her Answer.

**I.      Procedural History**

On August 19, 2009, Claimant Linda Lee Leininger filed Applications for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 157-63) and for

Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
therefore substituted for Michael J. Astrue as the Defendant in this action.

U.S.C. §§ 1381, et. seq. (Tr. 164-72).[2] Claimant states that her disability began on September 1, 1987, as a result of trichinosis with muscular atrophy and heart disease. (Tr. 196). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 62-66). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 71-72). On January 24, 2011, a hearing was held before an ALJ. (Tr. 24-60). Claimant testified and was represented by counsel. (Id.). Medical Expert Dr. John C. Anigbogu and Vocational Expert John F. McGowan also testified at the hearing. (Tr. 48-54, 54-59, 112-13, 147-48). Thereafter, on February 16, 2011, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 9-19). After considering the St. Louis Medical Center records dated March 31 - April 12, 2011, the Appeals Council on March 6, 2012 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-5, 381-87). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on January 24, 2011

#### 1.  Claimant's Testimony

At the hearing on January 24, 2011, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 30-48). Claimant's date of birth is January 15, 1951. (Tr. 30). Claimant is married and lives with her husband and two granddaughters. (Tr. 31). She is right-handed and has a driver's license. Claimant has not worked since March 31, 1989. (Tr. 32).

---

[2]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 13/filed June 22, 2012).

Claimant testified that she had a mini stroke in 1989. (Tr. 32). Claimant has problems with weakness. (Tr. 33). In response to the ALJ's question, she indicated that her immune system shut down five years earlier. (Tr. 33). Claimant testified that her appendix burst, and she was hospitalized for a week. (Tr. 34). In March 1989, Claimant was placed on Lipitor, and she had a mini stroke. (Tr. 34). Claimant testified that she was diagnosed with trichinosis after 1989, sometime in 2004, after having a biopsy taken at St. Johns. (Tr. 47). At that time, Claimant testified she was told she has had trichinosis for thirty-two years. (Tr. 47).

Claimant testified that she last worked in March 1989 at Lear, but she quit her job because she could not do it. (Tr,. 32). Claimant did not feel she was capable of working after March 31, 1989. (Tr. 34-35).

Claimant testified that in March 1989, she was able to drive, but she could not do any type of housework. (Tr. 35). Claimant had two inside dogs, and she cared for the dogs. (Tr. 36). Claimant could go to the grocery store alone without problem. (Tr. 36). Claimant would do the laundry and some cooking. (Tr. 37). Claimant testified that she was tired all the time, and she could only do eighty percent she used to be able to do. (Tr. 45). Claimant testified that she had to stop hunting and boating because of cramps. (Tr. 46).

Claimant now has legal custody of her grandchildren, ages fourteen and seventeen, and they do a lot for her. (Tr. 36).

### 2. Testimony of Medical Expert

Medical Expert Dr. John Anigbogu noted that Claimant received medical care during emergency room visits for knee pain and acute appendicitis. (Tr. 49). Sometime in 1990, Claimant was diagnosed with hypertension and high cholesterol anemia. (Tr. 49). Dr. Anigbogu

noted how Claimant is now experiencing muscle pain and weakness, and she was referred to a cardiologist. (Tr. 49-50). He noted some doctors recommended lifestyle changes, including smoking cessation. (Tr. 50). Dr. Anigbogu testified that Claimant had a muscle biopsy of the left deltoid muscles in 2006 and received the diagnosis of trichinosis in the pathology report, but no muscle abnormality was noted. Dr. Anigbogu noted in 2009-10 Claimant had a MRI for her low back pain which showed multiple level compression fractures and lumbar spinal stenosis at L2 to L3 and L4 to L5. Dr. Anigbogu opined those were the only medical problems Claimant had that he could see in the records. (Tr. 50).

Dr. Anigbogu found the only evidence of the trichinosis diagnosis was muscle weakness, but this was associated with her back pains. (Tr. 51). With respect to functional limitations prior to March 31,1989, Dr. Anigbogu opined Claimant had no functional limitations. (Tr. 51).

Dr. Anigbogu explained that trichinosis destroys some muscles and threatens the immune system. (Tr. 52). In response to counsel's question about Claimant's symptoms being attributed to trichinosis prior to 1989, Dr. Anigbogu explained that such symptoms could be attributed to a number of diseases, and he could not primarily associate the symptoms with trichinosis. (Tr. 52). Dr. Anigbogu noted that the diagnosis of trichinosis is made through a muscle biopsy and noted how Claimant had not made any complaints of muscle weakness in the medical records prior to 1989. (Tr. 54). Dr. Anigbogu noted that at the time of the emergency treatment for her appendectomy, Claimant did not report having any weakness or joint pain. Counsel noted how Claimant had testified about having muscle weakness prior to 1989. (Tr. 54).

### 3. Testimony of Vocational Expert

Vocational Expert John McGowan testified in response to the ALJ's questions. (Tr. 55-59). Dr. McGowan noted Claimant did not have any work within the last fifteen years. (Tr. 56).

The ALJ asked Dr. McGowan to assume that

> a hypothetical individual the claimant's age, educational background. The ability to perform the exertional demands of light work as defined in the Commissioner's regulations. Specifically, the individual can occasionally lift and/or carry 20 pounds, and frequently lifting and/or carry 10 pounds. The individual can stand and walk about six hours out of an eight-hour workday with norm breaks and sit for about six hours out of an eight-hour workday with normal breaks. The individual can occasionally climb ramps and stairs. Never climb ladders, ropes or scaffolds. Occasionally balance, stoop, kneel, crouch, and crawl. Would there by any jobs this individual could perform?

(Tr. 56). Dr. McGowan responded that the hypothetical worker would be at the light level with the only limitations being occasional balancing and avoiding climbing and no limitations on the use of hands. (Tr. 57). Dr. McGowan opined that such an individual could perform the following representative jobs: light bench assembly with DOT of 706.684-042 in terms of strength light and unskilled with 8,600 jobs in the region and 345,000 nationally; plastic product inspector and hand packaging with DOT 559.687-074, unskilled, light job with 1,730 in Missouri and 75,850 nationally; and machine operation with wire preparations machine tender with DOT 728.685-010 and unskilled, light job with 1,600 in Missouri and 47,900 nationally. (Tr. 57).

Next, counsel asked Dr. McGowan to assume the same limitations,

> however that individual cannot perform at a light exertional capacity. The individual is limited to less than sedentary exertional capacity. The individual can only stand for two hours our of an eight-hour day, and sit for four hours out of an eight-hour day. Would that individual be able to perform these jobs?

(Tr. 58). Dr. McGowan responded no noting that such hypothetical does not meet a full day's work. (Tr. 58).

Counsel asked if the individual described in either hypothetical had problems with going to the restroom or required unexpected restroom breaks would limit the ability to perform the jobs he described. (Tr. 58). Dr. McGowan responded such problems would certainly influence the performance of such jobs if these problems happened with any frequency inasmuch as all the jobs have a pace element. (Tr. 59). Counsel asked him to assume such person also was fatigued and could not sit in a boat for twenty minutes due to cramping or muscle problems. Dr. McGowan such person would not be able to perform any jobs. (Tr. 59).

### 4. Forms Completed by Claimant

In the Function Report - Adult, Claimant listed her daily activities to include starting the laundry and dishwasher, feeding inside animals, taking granddaughters to bus stop, doing minimal housework, and preparing dinner. (Tr. 209). Claimant reported taking care of her two granddaughters and her husband. (Tr. 210). Claimant takes care of a horse, feeding and brushing the horse, four dogs, feeding, brushing, and bathing, four inside cats, and four outside cats. (Tr. 210). Claimant prepares fresh food including meat, vegetables, and fish each day. (Tr. 211). Claimant listed her household chores to include some laundry, some vacuuming and sweeping, one load of laundry each day, and preparing one meal a day. (Tr. 211). Claimant tends to the animals three times a day and picks up and drops off her granddaughters. (Tr. 212). When going out, Claimant either walks or drives a car. Claimant goes to the store for grocery shopping. (Tr. 212). Claimant listed cooking, camping, hunting, and fishing as her hobbies and interests. (Tr.

213).  Claimant reported having to spend hours alone each day in order to make it through the day.  (Tr. 215).

In the Work History Report completed by Claimant on October 7, 2009, she indicated that she stopped working after being laid off.  (Tr. 207).

## III.    Medical Records[3]

Claimant produced no medical evidence prior to the date she was last insured, March 31, 1999.  The earliest evidence in the administrative record is dated 1990, one year after her date last insured.

On October 19, 1990, Linda Fisher was admitted through the emergency room at St. Joseph's Hospital West for signs and symptoms of acute appendicitis.  (Tr. 248).  An emergency laparotomy was performed, and an emergency appendectomy was performed.  Upon discharge, her activities were limited due to the incision.  (Tr. 248).  Upon admission, the patient denied having muscle or joint pain.  (Tr. 249-50).   The laboratory data showed the patient's white count to be slightly elevated, otherwise unremarkable.  (Tr. 250).  Examination showed full motor strength and sensation.  (Tr. 250).

On January 3, 1993, Linda Fisher received treatment in the emergency room at St. Joseph's Hospital after slipping on the ice the day before.  (Tr. 243).

---

[3]    The record reveals that the treatment notes from St. Joseph West Hospital were medical records for a Linda Fisher.  (Tr. 243-54).  In her application, Claimant noted having used another name, Linda Lee Balling.  (Tr. 157).  The undersigned notes that the medical records evidence treatment of acute appendicitis and knee injury after slipping.  Although the treatment notes were made in the context of a person seeking treatment for ailments unrelated to Claimant's medical impairments alleged to be disabling, the undersigned will consider the notes inasmuch as Claimant testified to having acute appendicitis and being in the hospital at the hearing.

In the August 7, 1997 letter, Dr. George Kichura noted Claimant to have a history of hypertension and hypercholesterolemia with chest discomfort. (Tr. 277). In the conclusions, Dr. Kichura found Claimant to have a mildly deconditioned heart rate response with exercise, hypertensive blood pressure response with exercise, and normal LV systolic function with no evidence of stress induced ischemia. (Tr. 277).

On September 4, 1998, Dr. Alan Braverman completed a cardiac evaluation and follow-up regarding hypercholesterolemia and chest pain. (Tr. 268). Claimant reported having a history of hypertension, hyperlipidemia, and cigarette smoking. In January 1998, she complained of her muscles being sore and decreased strength after working vigorously for about three days painting and fixing up a summer house on the farm. After doing a lot of work in three days, Claimant became very sore and experienced muscle weakness. Claimant reported having continued weakness in her muscles and fatigue over the past six months. (Tr. 268). Claimant has a history of cigarette smoking of one package a day for twenty-five years. (Tr. 269). Claimant reported living on a farm and being able to do all the activities there without any difficulty. Dr. Braverman noted Claimant to have multiple cardiac risk factors. (Tr. 269). Dr. Braverman confirmed Claimant has hyperlipidemia and recommended that she see a dietician for instructions on lowering her cholesterol. (Tr. 270). He discussed cigarette cessation with Claimant in great detail and cessation strategies. (Tr. 270).

On August 31, 2005, Dr. Braverman conducted a cardiac evaluation of Claimant on referral by Kelly Vago, a nurse practitioner. (Tr. 266). Claimant reported being active, taking care of her grandchildren and working vigorously around the house. Claimant smokes one package of cigarettes each day. (Tr. 266). The EKG showed sinus rhythm with nonspecific T

wave flattening. (Tr. 267). Dr. Braverman noted that Claimant has occasional palpitations, she drinks coffee and smokes. Dr. Braverman found that the coffee consumption and the cigarette smoking most likely are the reasons she has the sense of palpitations. He recommended Claimant have a stress echo and recommended diet and exercise and prescribed Zetia. (Tr. 267).

The September 21, 2005 stress echocardiography was negative for ischemia and terminated due to knee pain. (Tr. 275).

On April 11, 2006, Claimant received treatment in the emergency room at Missouri Baptist Medical Center for muscle weakness. (Tr. 256). Claimant reported working full time at General Motors. (Tr. 256). Dr. Ricardo Rao diagnosed Claimant with muscle left deltoid and trichinosis. (Tr. 258). The April 13, 2006 surgical pathology report showed trichinosis. (Tr. 308).

On November 16, 2007, Claimant returned for reevaluation by Dr. Braverman. (Tr. 264). He noted she has a history of coronary risk factors but is not known to have coronary artery disease. Claimant has a history of smoking two packages of cigarettes each day. Claimant reported being diagnosed with trichinosis in 2005 and seeing an infectious disease service but being told that there is no treatment for her disease. (Tr. 264). Dr. Braverman noted Claimant has multiple coronary risk factors, and recommend that she have stress echo but she indicated that she wanted to do it another time. (Tr. 265). Dr. Braverman recommended she diet, exercise and stop smoking. Claimant indicated that she is interested in trying Chantix. (Tr. 265).

The November 29, 2007 stress echocardiography showed normal diastolic function and normal results. (Tr. 273).

On April 30, 2008, Claimant returned for a blood pressure and cholesterol check and for fatigue and muscle weakness. (Tr. 300). Claimant reported seeing a rhuematologist for treatment of trichinosis. Examination showed a normal heart and no atrophy or weakness in muscluloskeletal. Ms. Vago continued her medication regime. (Tr. 300).

On May 21, 2008, Claimant returned for follow-up treatment. (Tr. 262). Dr. Braverman noted Claimant had stress test which was negative for ischemia. Claimant reported feeling well since the last visit and smoking over a package of cigarettes each day. Dr. Braverman believed Claimant to be hypertensive and prescribed carvedilol and discussed cessation of cigarette smoking. (Tr. 262).

In the September 17, 2008 progress note, Claimant reported congestive type symptoms and requested medications refills. (Tr. 299). Cardiac examination showed regular rate and rhythm, and no murmurs or gallops. Musculoskeletal examination revealed no atrophy or weakness and normal gait. (Tr. 299).

On November 12, 2008, Claimant reported to Dr. Musa Madod intensifying pain for four weeks. (Tr. 347).

Claimant reported feeling her heart pounding in her chest. (Tr. 343). On March 31, 2009, Claimant was evaluated by a Holter monitor[4] on referral by Ms. Vago. (Tr. 271-72).

In the April 13, 2009, letter, Dr. Braverman reported seeing Claimant in his office for follow-up treatment. (Tr. 260). Dr. Braverman noted Claimant has hypertension and hyperlipidemia,, and she is a cigarette smoker. Claimant reported still smoking and never trying

---

[4]A Holter monitor is "a technique for long-term continuous usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice." Stedman's Med. Dictionary (27th ed. 2000).

Chantix.  Dr. Braverman encouraged Claimant to discontinue cigarette smoking and indicated that he would see her annually for reevaluation.  (Tr. 260).

On September 9, 2009, Claimant requested blood work to be completed for her muscle aches, pain, and fatigue.  (Tr. 294).  Ms. Vago provided refills for medications and ordered routine blood work.  (Tr. 294).

On September 28. 2009, Claimant reported muscle weakness and fatigue during an office visit to Dr. Musa Modad.  (Tr. 290).  Claimant had a consultation with Ms. Vago to discuss disability.  (Tr. 329).  Claimant reported having a history of trichinosis possibly since childhood and increasing problems with muscle pain and weakness .  Ms. Vago noted that she helped Claimant complete the paperwork for disability and "instructed that if she needs anything else that we certainly can fill out her information to send in" and continued Claimant's placement on restricted activities of daily living.  (Tr. 329).

In the February 24, 2010 progress note, Claimant reported having fatigue and long term history of trichinosis since age nineteen.  (Tr. 323).  Ms. Vago encouraged Claimant to stop smoking and to continue her current diet.  (Tr. 323).

In the May 4, 2010, St. Louis Medical Clinic note, Dr. Richard DiValerio listed trichinosis and myalgia as her current problems.  (Tr. 316).  Claimant reported weakness and pain with walking.  Dr. DiValerio physical examination showed "[m]otor 5/5 thru-out."  (Tr. 316).

On September 12, 2010, Claimant was admitted to St. John's Mercy Medical Center for treatment of clostridium difficile colitis.  (Tr. 357).  During treatment, Claimant was strongly advised to quit smoking and not let people smoke in her home.  (Tr. 358).

On referral, Claimant was treated on November 19, 2010 at A&A Pain Institute for mid to low back pain. (Tr. 374-75).

In a "To Whom It May Concern" letter dated April 12, 2011, Dr. DiValerio noted as follows:

> Linda Leininger is a patient of ours at the St. Louis Medical Clinic. She has a history of severe myopathy, muscle weakness, easy fatigability[sic] secondary to presumed prior infection with trichinosis. She has, because of this condition, persistent muscloskeletal pain and weakness along with generalized fatigue.
>
> At this point, I feel that she is completely and totally disabled because of this condition and is unable to hold gainful employment at this time.

(Tr. 383).[5]

On the March 31, 2011 letter, Dr. DiValerio reported Claimant's recent cholesterol test results and recommended continuing a low fat, low cholesterol diet. (Tr. 385).

The November 4, 2011 MRI requested by Dr. DiValerio showed mild spinal canal stenosis and multiple compression deformities. (Tr. 369-70).

In a "To Whom It May Concern" letter dated March 20, 2012, Kelly Harness, a F.N.P. at the Cuba Clinic, noted as follows:

> I have known Linda Leininger for approximately 9 years. I was seeing her at the time of her referral to Dr. Divalerio[sic] due to her chronic muscle pain and fatigue. This is when Dr. Divalerio[sic] referred her out to Dr. Rao for a deltoid muscle biopsy and was found to have trichinosis. Linda was treated at that time with anti-parasitic medication and long term steroids but she did not improve. It was our concensus[sic] that because she had the trichinosis for so long that she would likely not respond to any treatment and her myalgia and fatigue would be chronic. Linda was unable to work long before her diagnosis due to chronic pain and fatigue and a few episodes of transient blindness which occurred while she was on her job. It was felt at the time that she was unsafe to work and she was

---

[5]A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005).

considered unable to work **and her last date of work in November of 1989 which is when she took the buyout from GM due to plant closure.** Her disability has continued through December of 1993 and continues at present time. For years she kept going to various specialist[*sic*] (which she has on file) and having testing done to get an answer and it wasnt[*sic*] until approximately 6 years ago that she finally had an answer from the muscle biopsy. I t is believed due to the biopsy outcome that she has had the trichinosis for 32 years due to ingesting raw pork product.

I have personally tried her on many medications such as savella, cymbalta, SSRis, and pain medications to see if we can alleviate some pain and fatigue but none of those have worked. She has been on chronic steroids because they help somewhat with the pain and she has since developed compression fractures of her spine. She now has chronic pain due to this and also a compromised immune system due to chronic steroid use and she developed colitis.

Linda also has a history of Myocardial infarction, stroke, and congestive heart failure. She has high blood pressure, and high cholesterol in which are treated sub-optimally due to an intolerance to statin medications.

Linda should be fully disabled. She is unable to work due to the chronic fatigue and pain and the medical problems that have ensued due to having trichinosis and its treatments.

(ECF No. 1 at 1-1) (emphasis added).

In a "To Whom It May Concern" letter dated April 10, 2012, Dr. Modad and Kelly

Harness noted almost verbatim to the earlier letter as follows:

I have known Linda Leininger for approximately 9 years. I was seeing her at the time of her referral to Dr. Divalerio[*sic*] due to her chronic muscle pain and fatigue. This is when Dr. Divalerio[*sic*] referred her out to Dr. Rao for a deltoid muscle biopsy and was found to have trichinosis. Linda was treated at that time with anti-parasitic medication and long term steroids but she did not improve. It was our concensus[*sic*] that because she had the trichinosis for so long that she would likely not respond to any treatment and her myalgia and fatigue would be chronic. Linda was unable to work long before her diagnosis due to chronic pain and fatigue and a few episodes of transient blindness which occurred while she was on her job. It was felt at the time that she was unsafe to work and she was considered unable to work **due to her being completely disabled in March 1989**. Her disability has continued through December of 1993 and continues at present time. For years she kept going to various specialist[*sic*] (which she has on

file) and having testing done to get an answer and it wasnt[*sic*] until approximately 6 years ago that she finally had an answer from the muscle biopsy. I t is believed due to the biopsy outcome that she has had the trichinosis for 32 years due to ingesting raw pork product. **She is currently only 1 in 57 people in the United States who suffer from this disorder.**

I have personally tried her on many medications such as savella, cymbalta, SSRls, and pain medications to see if we can alleviate some pain and fatigue but none of those have worked. She has been on chronic steroids because they help somewhat with the pain and she has since developed compression fractures of her spine. She now has chronic pain due to this and also a compromised immune system due to chronic steroid use and she developed colitis.

Linda also has a history of Myocardial infarction, stroke, and congestive heart failure. She has high blood pressure, and high cholesterol in which are treated sub-optimally due to an intolerance to statin medications.

Linda should be fully disabled. She is unable to work due to the chronic fatigue and pain and the medical problems that have ensued due to having trichinosis and its treatments.

(ECF No. 17 at Exh. A) (emphasis added).

## IV. The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity during the period from her alleged onset date of September 1, 1987 through her date of last insured of March 31, 1989. (Tr. 14). Claimant last met the insured status requirements of the Social Security Act on March 31, 1989. (Tr. 14). The ALJ found that the medical evidence establishes that Claimant had the following severe impairments through the date of insured: trichinosis with muscle atrophy and obesity, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 14-15). The ALJ opined that through the date of last insured, Claimant has the residual functional capacity to perform light work except she can frequently lift ten pounds and occasionally lift twenty pounds;

stand, walk, and sit for six hours out of an eight-hour workday; occasionally climb ramps or

stairs, but never ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, or

crawl. (Tr. 15). The ALJ found that Claimant is unable to perform any past relevant work. (Tr.

18).

The ALJ found Claimant was born on January 15, 1951 which is defined as a younger

individual on the date last insured. (Tr. 18). The ALJ noted Claimant has a high school education

and able to communicate in English. The ALJ noted that the transferability of job skills is not an

issue because she does not have any past relevant work. Considering Claimant's age, education,

work experience, and residual functional capacity, the ALJ opined that there are jobs in significant

numbers in the national economy that Claimant can perform at the light level of work activity.

(Tr. 18). The ALJ concluded that Claimant was not been under a disability at any time from

September 1, 1987, the alleged onset date, through March 31, 1989, the date last insured. (Tr.

19).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

At the outset, the undersigned notes that Claimant has the burden of proving she was disabled prior to the expiration of her insured status on March 31, 1989. To be eligible for disability benefits under Title II, Claimant must establish that she became disabled prior to the expiration of her insured status on March 31, 1989. See Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007) ("Davidson's insured status expired on December 31, 2003, so like the Commissioner, we consider her condition before that date."); Cox v. Barnhart, 471 F.3d 902, 907

(8th Cir. 2006) ("To be entitled to benefits Cox must prove she was disabled before her insurance expired on December 13, 1995."). When an individual is no longer insured for Title II purposes, medical evidence of their condition will only be considered as of the date the individual was last insured. "A non-disabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II." Eggering v. Astrue, Cause No. 4:10cv821 TIA, 2011 WL 3904103 at *7 (E.D. Mo. Sept. 6, 2011). While evidence from outside the insured period can be used in "helping elucidate a medical condition during the time for which benefits might be rewarded," it cannot serve as the only support for the disability claim. Cox, 471 F.3d at 907; Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998). "When an individual is no longer insured for Title II disability purposes, [the Court] will only consider an individual's medical condition as of the date she was last insured." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997); 20 C.F.R. 404.130. New evidence is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition. Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997). Here, Claimant's insured status expired on March 31, 1989. Therefore, the ALJ was not required to consider the medical evidence and opinions dated after that date unless it bears upon the severity of her condition before the expiration of her insured status.

Under 42 U.S.C. § 423(a)(1)(A) and (c)(1), an individual is only eligible to receive disability insurance benefits if she was insured under the Act at the time of the onset of her disability. See also 20 C.F.R. §§ 404.130, 404.315(a); Kane v. Heckler, 776 F.2d 1130, 1131 n.1 (3d Cir. 1985). Here, the onset date of Claimant's disability is critical because it is determinative of whether she is entitled to benefits at all. See SSR 83-20, 1983 WL 31249, at *1 (1983). The

- 19 -

ALJ determined, and the parties do not dispute, that based on Claimant's work history,[6] the date when she was last insured was March 31, 1989.  Therefore, to be entitled to benefits, Claimant was required to show that she became disabled before this date.  Claimant claims she became disabled on September 1, 1987.  There are no medical records of ongoing treatment of trichinosis or other medical ailments.  Even assuming Claimant was diagnosed before 1989, she has not provided any evidence beyond her hearing testimony to demonstrate that the condition significantly limited her ability to do basic work activities in 1987 or 1988 nor has she argued that she was prevented from seeking treatment during this period.  *Cf.* Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547-48 (3d Cir. 2003) (explaining that where an individual provides a reason for failing to seek treatment, the ALJ should not infer that no disability existed based on the lack of medical records.).

Additionally, Claimant cannot rely on her testimony alone that she met the requirements for receiving disability insurance benefits prior to March 31, 1989.

---

[6]The undersigned notes that the record is unclear whether Claimant stopped working because of her alleged disabling impairments or being laid off.  See McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (inconsistencies in the record detract from a claimant's credibility).  At the hearing, Claimant testified that she stopped working because she could no longer do her job.  In the March 20, 2012 letter, the reason given for Claimant to stop working was that she took the buyout from GM due to plant closure.  In the Work History Report, Claimant indicated that she stopped working after being laid off.  The Eighth Circuit has found it significant when a claimant leaves work for reasons other than disability.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005)(claimant stopped working after being fired, not because of her disability); Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (claimant's leaving work for reasons unrelated to medical condition detracted from credibility); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged);  Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her job due to lack of transportation, not due to disability).  See also Lindsay v. Astrue, 2009 WL 2382337, at *3 (W.D. Mo. July 30, 2009) ("Plaintiff reported looking for work and contacting temporary agencies.  These statements are inconsistent with disability and indicate that Plaintiff did not view his pain as disabling.").

An individual's statement as to pain or other symptoms shall not alone be conclusive of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished ... would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423 (d)(5)(A).

Based on testimony, medical evidence, and requirements for establishing disability during the relevant time period, Claimant has failed to carry her burden to establish that she is eligible for disability benefits during the relevant time period. Substantial evidence in the record supports the ALJ's decision.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to fully and fairly develop the record. Claimant further contends that the ALJ erred in failing to obtain medical records and dismissing the medical expert. Additionally, Claimant argues that the ALJ failed to obtain clarification from her treating physician.

A.    ALJ's Failure to Develop the Record

Claimant also argues that the ALJ had a duty to obtain medical records before the date of last insured before the hearing.

In this case, there were no medical records in the transcript that were dated prior to October 19, 1990. The ALJ noted that Claimant met the insured status requirements of the Act through March 31, 1989, and found that Claimant has not been under a disability from September

1, 1987, through the date of last insured.  The undersigned believes there is no ambiguity in the onset date.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  This can be done by recontacting medical sources and by ordering additional consultative examinations, if necessary.  See 20 C.F.R. § 404.1512.  The ALJ's duty to fully and fairly develop the record is independent of Claimant's burden to press her case.  Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).  However, the ALJ is not required to function as Claimant's substitute counsel, but only to develop a reasonably complete record.  See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) ("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.").  "The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment.  They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."  Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 1989).  "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in the original).

Claimant contends that the ALJ failed to adequately develop the record by not obtaining sufficient medical opinion as to the likely extent and severity of her impairments prior to her date of last insured.  Claimant has provided no medical evidence to show a disabling impairment prior to the date of last insured.  Cox v. Barnhart. 471 F.3d 902, 907 (8th Cir. 2006) (claimant must show the existence of a disability prior to expiration of insured status) (citing Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998)).  Claimant has the burden of proving her disabilities and presenting

the strongest case possible.  Mouser v. Astrue, 545 F.3d 634, 637 (8th Cir. 2008) (citing Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991)).  In the instant case, the ALJ considered Claimant's entire treatment history, including medical records subsequent to the date  last insured, and determined Claimant could perform light work.  Substantial evidence supports this determination.

The record shows that Missouri DDS contacted Midwest Heart Group and St. Joseph Hospital West based on Claimant's representation that she received treatment from George Kichura.  (Tr.199, 286-87).  In response to the request for medical records of George Kichura at Midwest Heart Group from "9/86- current," the following notation was made: "This request is being returned, we do not have the information requested."  (Tr. 285-87).  St. Joseph Hospital West provided treatment records from October 1990.  (Tr. 243-55).

Likewise, Claimant's contention that the ALJ should have obtained a consultative examination is without merit.  In Halverson v. Astrue, 600 F.3d 992, 933 (8th Cir. 2010), the Eighth Circuit rejected a claimant's argument that the ALJ had erred by not ordering a consultative mental examination, finding that the ALJ had properly based his adverse decision on the medical records, the claimant's statements, and "other evidence."  See also Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) ("[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.") (internal quotations omitted).  A consultative examination performed in 2011 over twenty years later would not produce information for the relevant time period.  "'The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether a

claimant is disabled.'" Halverson, 600 F.3d at 933 (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)). Where there is substantial evidence in the record to support the ALJ's decision, the ALJ does not err in failing to order a consultative examination. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). The paucity of evidence of treatment for Claimant's alleged impairments does not detract from this substantiality. See e.g. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitation "should not be held against the ALJ when there is medical evidence that supports the ALJ's decision.").

An ALJ's duty to develop the record arises only if a crucial issue was undeveloped. Although the record does not contain medical evidence from the relevant time period regarding Claimant's alleged disabilities, such records could not be obtained as Claimant testified at the hearing. (Tr. 40). See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (reversal due to failure to develop the record is warranted only where the failure is unfair or prejudicial). The duty to develop the record "is not never-ending and an ALJ is not required to disprove every possible impairment." Baldwin v. Astrue, 2012 WL 3815623, *17 (E.D. Mo. Sept. 4, 2012). The ALJ "is not required to function as the claimant's substitute counsel." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). After the hearing, Claimant's counsel could have requested such records and attached the records to her brief for review by this Court as a basis for remand.

However, reversal due to failure to develop the record is only warranted where such failure was unfair or prejudicial. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Here, a crucial issue was not undeveloped; rather, it was developed adversely to Claimant. See Sopelle ex rel. A.N.S. v. Astrue, 2010 WL 5113873, *6 (D.Minn. Nov. 23, 2010) ("[i]n considering whether a case

should be remanded because the ALJ did not fully develop the record, the reviewing court must consider whether the claimant was prejudiced or treated unfairly; absent unfairness or prejudice, the court will not remand.") (citing <u>Onstad v. Shalala</u>, 999 F.2d 1232, 1234 (8th Cir. 1993)). The undersigned finds that the ALJ did not fail in his duty to fully and fairly develop the record.

B.     <u>Medical Expert Dr. Anigbogu</u>

Claimant further contends that the ALJ erred in not dismissing the medical expert. In particular, Claimant alleges that the medical expert had not been paying attention at the hearing or possibly had fallen asleep at the hearing.

Claimant makes this argument without providing any evidence in support or supporting affidavits.[7] At the hearing, Claimant nor her counsel never asserted that Dr. Anigbogu had been inattentive or possibly sleeping. Inasmuch as Claimant has provided no basis for striking the medical expert's testimony except for speculation, the Court finds no error in the ALJ permitting the medical expert to testify.

C.     <u>Recontacting Treating Physician</u>

Claimant next contends that the ALJ should have recontacted Dr. Musa Modad, her treating physician. In support, Claimant cites to the "To Whom It May Concern" letter dated April 10, 2012, wherein Dr. Modad opines that Claimant is disabled and has suffered from trichinosis for thirty-two years.

An ALJ should recontact a treating or consulting physician if a critical issue is undeveloped. <u>See</u> <u>Ellis</u>, 392 F.3d at 994. The ALJ is not required to recontact any physician

---

[7]In the April 19, 2011 Sir/Madame letter noting the submission of records from St. Louis Medical Center, counsel includes the following: "Claimant wants the appeal council to know that the medical expert was asleep during parts of the trial." (Tr. 382).

whenever he rejects that physician's opinion.  See Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).  "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).

First, the undersigned notes that the letter is dated over one year after the ALJ issued his opinion.  Indeed, the undersigned notes that the letter is almost identical to the March 20, 2012 letter but the April 10, 2012 letter includes the assertion that she stopped working due to her being completely disabled in March 1989 whereas in the earlier letter Claimant stopped working in November of 1989 which is when she took the buyout from GM due to plant closure.  Next, Dr. Modad's treatment notes and those of her nurse practitioner are in the record.  A review of the record does not support a finding that Claimant has been disabled by trichinosis for thirty-two years.  "[A] lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).  Indeed, Dr. Modad never found Claimant to be disabled or noted any functional limitations in the treatment notes.  An ALJ may "discount or even disregard the opinion of a treating physician where the treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); see also Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

As noted by the ALJ, the medical evidence did not support the presence of disabling limitations due to trichinosis or muscle atrophy. During a consultative examination in1998, Claimant reported living on a farm and being able to do all the activities there without any difficulty. During treatment for appendicitis, Claimant denied any muscle or joint pain, and examination showed full motor strength and sensation.

Claimant does not state how recontacting Dr. Modad – or an other medical source - would assist her case. Nor does she state what critical issue is undeveloped. Because the record evidence provides a sufficient basis for the ALJ's decision, the undersigned finds no error.

D.    New and Material Evidence

Claimant next argues that the April 10, 2012 letter signed by Dr. Modad is the basis for the Court to remand  The undersigned finds that, even in light of the new evidence, substantial evidence supports the ALJ's decision.

Remand to consider the new evidence is proper only where plaintiff demonstrates that the evidence "is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). New evidence is material where it is "'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008)  (quoting Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997)).  "Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing sufficient explanation." Hepp, 511 F.3d at 808; see also Ferguson v. Comm'r of Social Sec., 628 F.3d 269, 276 (6th Cir. 2010) ("A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for

inclusion in the hearing before the ALJ...") (internal citation and quotation omitted).

"Furthermore, it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." Jones, 122 F.3d at 1154.

Here, the letter from Claimant's treating physician could have been obtained prior to the closing of the administrative record. The undersigned notes that Dr. Modad completed the letter over a year after the ALJ rendered his opinion and is not probative of Claimant's condition during the time period for which benefits were denied. Although Dr. Modad opined that Claimant was disabled prior to March 31, 1987, she had no treatment relationship with Claimant during that time period, nor did she cite any medical evidence from the relevant time period to support her opinion. Dr. Modad's letter provides no basis for remand because it is unlikely to change the Commissioner's decision. See Jones, 122 F.3d at 1154 (it must be reasonably likely that the Commissioner's consideration of the new evidence would have resulted in an award of benefits).

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

E.    Specialized Medical Expert

Finally, Claimant contends that the ALJ erred in utilizing a medical expert who was not an infectious disease specialist.  In support, Claimant cites HALLEX.

The undersigned notes that there is a case from this District that has expressly considered this issue.  In Ellis v. Astrue, the Honorable Audrey Fleissig opined that "[t]his Court believes that the Eighth Circuit would hold that HALLEX does not have the force of law."  Ellis v. Astrue, 2008 WL 4449452, *16 (Sept. 25, 2008) (citing Shontos v. Barnhart, 328 F.3d 418, 424 n.7 (8th Cir. 2003) (the Social Security Administration's Program Operations Manual Systems (POMS) guidelines do not have legal force and do not bind the Commissioner; still, an ALJ should consider them)).

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted).  "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits."  Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  30th  day of August, 2013.